## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MELINDA BROWN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08- 1265** |
| | ) | **Judge Joy Flowers Conti** |
| **COMMISSIONER OF SOCIAL** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **SECURITY,** | ) | |
| **Defendant.** | ) | **Re: Doc. Nos. 11 & 15** |

### REPORT AND RECOMMENDATION

### I.      Recommendation

Melinda Brown ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), § 1383C(3), for review of the final determination of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI").  (Doc. No. 3 at ¶ 1). Plaintiff filed a motion for summary judgment (Doc. No. 11), and brief in support (Doc. No. 12) on February 21, 2009.  The Commissioner filed a cross-motion for summary judgment (Doc. No. 15), and brief in support (Doc. No. 16) on April 9, 2009. For the following reasons, it is respectfully recommended that the Commissioner's motion for summary judgment be denied.  It is further recommended that Plaintiff's motion for summary judgment be granted and that this case be remanded to the Administrative Law Judge for further consideration.

1

II.     **Report**

## Introduction

Plaintiff protectively filed for SSI on December 29, 2004 (R. at 63) alleging disability due to sickle cell anemia and depression (R. at 66), with an alleged onset date of December 1, 2004. (R. at 63). Her claim was initially denied by the state agency on June 24, 2005. (R. at 30- 32). Plaintiff filed a request for a hearing before an administrative law judge ("ALJ") on September 7, 2005. (R. at 37). A hearing was held before ALJ Paul R. Sacks on March 8, 2007. (R. at 193). Plaintiff, who was represented by counsel, appeared at the hearing and testified on her own behalf. (R. at 195-215). Additionally, the ALJ heard the testimony of an impartial vocational expert, Mary Beth Kopar. (R. at 215-18).

The ALJ issued a decision on September 27, 2007, determining that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act. (R. at 11-12; 22). Plaintiff thereafter filed a timely request for review of the ALJ's decision (R. at 10), which was denied by the Appeals Council on July 30, 2008, making the ALJ's decision the final decision of the Commissioner. (R. at 5). Having exhausted her administrative remedies, the Plaintiff filed a timely cause of action in this Court, seeking review of the final decision of the Commissioner. (Doc. No. 3).

## Plaintiff's Background and Medical History

At the time of the administrative hearing, Plaintiff was thirty-three years old. (R. at 197). She has five children, (three girls and two boys), ranging in age from fifteen to two. (*Id.*). At the time

of the hearing, her six year old son lived with her mother-in-law, but all of her other children lived with Plaintiff and her husband. (R. at 197-98).  Plaintiff testified that she took special education classes in school and quit school after the tenth grade. (R. at 200).  She has had no other type of schooling or vocational training, nor has she completed her GED. (*Id.*).

Plaintiff's most recent work history includes work as a cleaning person from 1997-1998. (R. at 67).  Plaintiff has never had any position that lasted longer than a couple of months. (R. at 201). Plaintiff testified that she is unable to work due to pain as a result of sickle cell amenia and depression. (R. at 201).  She testified that she is treated with folic acid for sickle cell, but that she continues to have pain in her joints and bones. (R. at 203-4).  Additionally, she testified that she attends therapy once a month for her depression. (R. at 206).  She indicated that, at the time of the hearing, she continued to hear voices, but that it had improved. (R. at 207).  She also testified that she was constantly sleeping as a result of the depression. (R. at 208).  In addition, she testified that she was tired, lacked motivation and had difficulty concentrating. (R. at 212).

### Dr. Michael Moran, Phd.

Plaintiff was seen by a consultative examiner, Dr. Michael Moran, Ph.d. on July 23, 2003. (R. at 91).  Dr. Moran performed an intellectual assessment based on the Wechsler Adult Intelligence Scale – Third Edition(WAIS-III), the results of which indicated that Plaintiff had a Verbal IQ of 72, a Performance IQ of 74 and a Full Scale IQ of 70. (R. at 93).  Dr. Moran noted the following:

> These results indicate that at the time of this evaluation global intellectual functioning was in the lower end of the Borderline range. She seemingly made a genuine effort to perform well on every one of the WAIS-III tasks, and it is felt that the results are reliable and accurately reflect her level of intellectual functioning at the time of this evaluation.

3

(*Id.*)  Specifically, Dr. Moran also opined that Plaintiff's functional vocabulary was "quite limited," her abstract verbal reasoning was borderline, her reasoning ability in the mild mental retardation range and rote auditory memory at the immediate recall level was impaired. (*Id.*) Additionally, Dr. Moran determined that testing indicated that Plaintiff had significant perceptual-motor deficits and impairment in her ability to discriminate essential from non-essential details in the visual field. (*Id.*). He also noted that she was impaired in her ability to learn new, non-verbal material rapidly, to resolve visually presented problems and to perceive cause and effect relationship in the social context. (*Id.*) He noted, however, that  Plaintiff "is relatively strong in her ability to form nonverbal concepts and to perceive and understand spatial relations." (*Id.*)

Plaintiff was also administered a WRAT-III Reading Test and earned a score of 4.0 Grade Equivalency Level. (*Id.*).  Dr. Moran also gave Plaintiff the following diagnoses: alcoholism, reportedly in remission, crack cocaine addiction, reportedly in remission, borderline intellectual functioning and congenital sickle cell anemia. (R. at 94).  He determined that Plaintiff's prognosis was guarded and that Plaintiff "would definitely need a representative payee" if awarded social security benefits. (*Id.*).

Dr. Moran indicated that Plaintiff had moderate restrictions in her ability to understand, remember and carry out simple instructions. (R. at 95).  He also noted marked restrictions in her ability to understand and carry out detailed instructions and moderate restrictions in her ability to make judgments on simple, work-related decisions. (*Id.*).  Additionally, he noted moderate limitations in her ability to interact appropriately with the public, to respond appropriately to work pressures in a usual work setting and to respond appropriately to change in a routine work setting.

(*Id.*).  He opined that Plaitniff had marked restrictions in her ability to interact appropriately with supervisors and co-workers. (*Id.*).

**Dr.James Gleason, MD**

Plaintiff was seen by another consultative examiner, Dr. James Gleason, on August 4, 2003. (R. at 97).  Specifically, she was referred due to a diagnosis of sickle cell anemia. (*Id.*).  Dr. Gleason's report indicates that, on physical examination, Plaintiff's strength was 5/5 and equal. (R. at 99).  Additionally, he noted that Plaintiff's gait was normal and that she was able to get up and down off of the examination table without difficulty. (Id.).  He noted that there was no joint swelling or tenderness. (*Id.*). He diagnosed Plaintiff with sickle cell anemia with recurrent crisis. (*Id.*).  Additionally, he noted diagnoses of depression under fair control and crack cocaine and alcohol addiction in remission. (*Id.*).

**Dr. Eric Bernstein Psy.D.**

Plaintiff was seen by a consultative examiner, Dr. Eric Bernstein, Psy.D. on March 28, 2005. (R. at 100).  Plaintiff was specifically referred to Dr. Bernstein for an evaluation of the effects of her complaints of sickle cell anemia and depression. (*Id.*).   In regard to Plaintiff's mental status examination, Dr. Bernstein determined that Plaintiff was oriented to all spheres, including person place and situation. (R. at 102).  He further noted that Plaintiff's knowledge of general information appeared to be "well below average." (*Id.*).  Specifically, he noted that Plaintiff had a difficult time identifying the president and did not know who the first president was.  (*Id.*).  Additionally, Plaintiff was not able to distinguish between the city and state where she lived and could not define the phrase "Don't judge a book by its cover."  (*Id.*).  Dr. Bernstein's records also indicate that Plaintiff's

5

abstract reasoning skills appeared to be limited, but that her response to social hypothetical situations appeared to be appropriate. (*Id.*).

Dr. Bernstein opined that, if Plaintiff were to received disability benefits, she would have difficulty managing them. (R. at 103).  He diagnosed Plaintiff with cocaine dependence, in early partial remission, psychotic disorder, non-specific, mild and recurrent major depressive disorder. (*Id.*).  He assigned her a Global Assessment of Functioning score of 53.  (R. at 104).  He opined that her prognosis at the time of the examination was guarded. (*Id.*).

In Dr. Bernstein's assessment, Plaintiff had no restrictions in her ability to understand and remember simple instructions and slight restriction in her ability to carry out short, simple instructions, understand and remember detailed instructions, carry out detailed instructions and make judgments on simple work-related decisions. (R. at 105).  He further indicated that she had no restrictions in her ability to interact appropriately with the public, supervisors or co-workers and slight restriction in her ability to respond appropriately to work pressures in a usual setting and to respond appropriately to changes in a routine work setting. (*Id.*).

**Dr. Abdul Kahn, M.D.**

Plaintiff was referred to Dr. Abdul Kahn, M.D. for a consultative examination on May 9, 2005. (R. at 107).  Dr. Khan noted Plaintiff had complaints of joint aches and pains, joint swellings, muscle aches, sad mood, low energy, poor appetite, fatigue and nausea. (R. at 108).  After physical examination, Dr. Khan's impression was that Plaintiff had a history of sickle cell anemia, but was doing fairly well. (R. at 109).  He noted no evidence of joint deformities, pain or other symptoms at the time of the exam, although she did have off and on symptoms in the past. (*Id.*).  Additionally,

Dr. Khan noted a history of depression and that Plaintiff had been prescribed Effexor and Risperdal. (*Id.*).  He further noted that she had no history of psychiatric hospitalization and that, at the time of the examination, she was seeing a therapist weekly. (*Id.*).

### Dr. Dawn Friend, Psy.D.

Plaintiff was seen by another consultative examiner, Dr. Dawn Friend, Psy.D., on May 7, 2007. (R. at 185).  Dr. Friend noted that Plaintiff was oriented in all spheres at the time of the examination. (R. at 187).  Additionally, she determined that Plaintiffs immediate auditory memory was fair and her general fund of knowledge appeared to be adequate. (*Id.*).  Additionally, Dr. Friend determined that Plaintiff was not able to complete serial 7's, but that she was able to spell the word "world" backwards. (*Id.*).  Plaintiff was able to complete simple calculations, but was unable to complete a simple narrative problem, which required mathematical reasoning. (*Id.*).  Dr. Friend noted that Plaintiff's concept formations for simple relations were slightly impaired.  For instance, when asked how a fly and a tree were alike, Plaintiff stated, "They ain't."  Dr. Friend also found Plaintiff's social and test judgment to be slightly impaired and found her to be "primitive in her understanding of complex social concepts and problem solving abilities." (*Id.*).

Dr. Friend diagnosed Plaintiff with depressive disorder, non-specific, alcohol dependence in sustained full remission, crack cocaine dependence in sustained full remission, major depressive disorder, recurrent and severe with psychotic features and borderline intellectual functioning. (R. at 187-88).  With respect to Plaintiff's prognosis, Dr. Friend's report states that, at the time of the examination, it was "fair as she appears motivated to continue receiving treatment for her symptoms. …" (R. at 188).  Dr. Friend opined that Plaintiff would be capable of handling her own financial

7

affairs with adequate judgment. (*Id.*).

Dr. Friend indicated that Plaintiff had slight restrictions in her ability to understand and remember and carry out short, simple instructions. (R. at 189).  Additionally, she indicated that Plaintiff had moderate restrictions in her ability to understand, remember and carry out detailed instructions and to make judgments on simple work-related decisions. (*Id.*).  She also determined that Plaintiff had no restrictions in her ability to interact with the public, co-workers or supervisors. (*Id.*).  She noted that Plaintiff had moderate restrictions in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (*Id.*).

**UPMC Western Psychiatric**

On January 27, 2005, Plaintiff was seen for a psychiatric evaluation by Theo Bucci, LSW, MSW at UPMC Western Psychiatric.  (R. at 172). Records from that visit indicate that Plaintiff was seen for severe depressive symptoms including sadness, helplessness, low energy, sleeplessness, hopelessness and passive thoughts of wishing she were dead. (*Id.*).  The records also note a history of crack cocaine abuse, with a clean date at that point of January 18, 2005. (*Id.*).  At the time of the evaluation, two of Plaintiff's five children lived with her; two were in foster care and one was at the Bradley Center. (*Id.*).  With respect to Plaintiff's educational issues, it was noted that she received good grades in school, but did not graduate and did not receive a GED. (R. at 173). At that time, she was given diagnoses of Major Depressive Disorder with recurrent severe psychotic features and cocaine dependence. (R. at 176).

Plaintiff received individual therapy from Theo Bucci again on February 3, 2005. (R. at 171). She discussed getting her children back as a goal. (*Id.*).  At a March 31, 2005 therapy session,

Plaintiff indicated that she was attending Narcotics Anonymous meetings to avoid relapsing again. (R. at 170).  She reported to the therapist that "things were going well with she and her husband and the baby." (*Id.*).  She indicated that her goal was to remain clean in order to get her children back. (*Id.*).  On May 11, 2005, Plaintiff reported that she was not doing well and was having difficulty abstaining from drugs. (R. at 169).  At this time, Plaintiff indicated a plan to attend a drug rehabilitation program starting that week. (*Id.*).

Notes from therapy indicate that Plaintiff was seen again at UPMC Western Psychiatric on August 9, 2005. (R. at 168).  Records from that session indicate that Plaintiff was completing a drug rehabilitation program and that she was continuing to try to regain custody of her older children. (*Id.*).  On September 6, 2005, Plaintiff was seen for routine medication management. (R. at 165).  The records indicate that Plaintiff had prescriptions for Risperdal and Effexor. (*Id.*).  They further indicate diagnoses of Major Depressive Disorder with recurrent, severe psychotic features, cocaine and alcohol dependence and canabis abuse. (*Id.*).

At her therapy appointment on September 13, 2005, Plaintiff indicated that she was not feeling better and that she was often angry, but could not identify what made her so. (R. at 164).  She reported that she continued to attend outpatient drug rehabilitation five days a week and had six clean months as of that date. (*Id.*).  On October 25, 2005, Plaintiff was in a good mood. (R. at 163).  She noted that she would be graduating from  drug rehabilitation and was proud of this accomplishment. (Id.).  At this time, she was not getting along well with her husband, but was hopeful that she would get her children back. (*Id.*).

On November 8, 2005, Bucci noted that Plaintiff's mood was irritable and her affect was

9

congruent. (R. at 162).  She did express that she was looking forward to her graduation program at the rehabilitation center. (*Id.*).  Notes from November 17, 2005 indicate that Plaintiff continued to treat with Risperdal and Effexor. (R. at 160-161).  On November 22, 2005, Plaintiff reported to her therapist that she was very happy, as she was granted unsupervised visits with her children and had graduated from her drug rehabilitation program. (R. at 157).  She indicated that she was going to meetings in order to keep her recovery. (*Id.*).  Bucci noted that Plaintiff was in a very good mood and her affect was congruent. (*Id.*).

On December 6, 2005, Bucci again noted that Plaintiff was in a good mood and her affect was congruent. (R. at 156).  She had been clean for nine months and was having weekend visits with her children. (*Id.*).  She indicated that she was getting along better with her husband and that she was currently looking for work. (Id.).  She also indicated that she was going to meetings on a daily basis and speaking with her sponsor often. (*Id.*).

On January 10, 2006, Bucci again indicated that Plaintiff was in a very good mood and her affect was congruent. (R. at 155). She reported that she was given custody of her two daughters and that she would probably get her son back as well. (*Id.*).  She indicated that she continued to go to meetings and to work on her recovery program. (*Id.*).  On January 17, 2006, Plaintiff was seen by Dr. Christopher Hasseltine for medication management. (R. at 151).  According to these records, Plaintiff reported that her substance abuse was in remission and her paranoia was well controlled. (R. at 153).  She indicated that her mood was stable on her medications and overall felt like she was doing well. (*Id.*).

On April 13, 2006, Plaintiff was seen for therapy and the records indicate that she was in a

very good mood and her affect was congruent. (R. at 150).  She reported that she had custody of all of her children and that she was very happy about that. (*Id.*).  She also indicated that she and her husband were getting along and she felt confident that her family would be able to work out their living situation. (*Id.*).  On May 16, 2006, Plaintiff indicated that her relationships were improving and that she was experiencing no cravings to use. (R. at 149).

On September 28, 2006, Plaintiff reported to her therapist that things were going very well for her. (R. at 147).  The records indicate that Plaintiff's mood was good and her affect was congruent. (*Id.*).  According to her therapist, Plaintiff "smiled quite a bit during the session and was more animated than usual.  She appear[ed] to be handling her children well....  The client is not suicidal, homicidal, has no auditory or visual hallucinations, has no delusions and is not paranoid." (*Id.*).  Again on October 30, 2006, Plaintiff's therapist indicated that Plaintiff was in a good mood. (R. at 145).  Plaintiff reported that she was going to school to take the test to get her GED. (*Id.*).  Additionally, Plaintiff indicated that she had a goal of obtaining her nursing degree and planned to continue with schooling. (*Id.*).  At that time, the records indicate that Plaintiff continued to be treated with Effexor and Risperdal. (*Id.*).  Both were increased at that visit. (*Id.*).

### Standard of Review

In reviewing an administrative determination of the Commissioner, the question before the Court is whether there is substantial evidence in the administrative record to support the findings of the Commissioner that the plaintiff has failed to sustain her burden of demonstrating that she was disabled within the meaning of the Social Security Act.  42 U.S.C. § 405(g).  *See also Richardson v. Perales*, 402 U.S. 389 (1971); *Adorno v. Shalala*, 40 F.3d 43 (3d Cir. 1994).  Section 405(g)

specifically provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ....

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 2000) (citing *Pierce v. Underwood*, 487 U.S. 552 (1988)); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999). Although there may be contradictory evidence in the record, and/ or although this Court may have found otherwise, it is not cause for remand or reversal of the Commissioner's decision if substantial support exists.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

## Discussion

Under the Social Security Act, an individual is considered disabled when she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. ...

42 U.S.C. §§ 416(i)(1)(A); 423(d)(1)(A); 20 C.F.R. § 404.1505.  A person is unable to engage in substantial gainful activity when she:

> is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work. ...

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner applies a five step sequential evaluation process for determining whether the claimant is under a disability as defined by the Social Security Administration. *See* 20 C.F.R. § 404.1520; *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). In step one of the evaluation process, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). If so, the disability claim will be denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If not, the second step of the process is to determine whether the claimant is suffering from a severe impairment. *See* 20 C.F.R. § 404.1520C. If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits. If the claimant does have a severe impairment, however, the Commissioner must proceed to step three and determine whether the claimant's impairment meets or medically equals the criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appdx. 1. *See* 20 C.F.R. § 404.1520(d). If the claimant meets a listing, it directs a finding of disability. *Id.* If the claimant does not meet a listing, the analysis proceeds to steps four and five.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. § 404.1520(e). The claimant bears the burden of demonstrating an inability to return to his or her past relevant work. *See Adorno v. Shalala*, 40 F.3d 43, 36 (3d Cir. 1994). If the claimant is unable to perform past relevant work, the evaluation moves to the fifth step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in the national economy in order to deny a claim of disability, based on the claimant's

13

residual functional capacity, as well as her age, education and past relevant work experience.  *See* 20 C.F.R. § 404.1520(g).

Here, the ALJ made the following findings in applying the five step sequential evaluation process.  The ALJ determined that Plaintiff had not engaged in substantial activity since December 28, 2004. (R. at 16).  He determined at step two that Plaintiff has the following severe impairments: alcohol abuse, in remission; drug abuse, in remission; depressive disorder; borderline intellectual functioning and sickle cell anemia. (*Id.*).  At step three, the ALJ determined that none of Plaintiff's impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appdx. 1.  (R. at 17).  Specifically, the ALJ considered the requirements of listings 12.04, 12.05 and 12.09, and determined that Plaintiff does not meet any of the requirements of these listings. (R. at 17-18).

The ALJ further determined that, while Plaintiff has no past relevant work history (R. at 20), based on her residual functional capacity, age, education and work experience, there are jobs that exist in the national economy in significant numbers that Plaintiff can perform. (R. at 21).  Specifically, the ALJ determined that Plaintiff has the residual functional capacity to perform light work, except that she needs to sit and stand at will, must avoid cold temperature extremes, and must be limited to simple one-two step jobs and routine repetitive jobs. (R. at 19).  Additionally, she must avoid work in close proximity with co-workers and jobs where decision making is involved. (*Id.*).  He also determined that she must avoid jobs requiring a competitive production rate pace and jobs with intensive supervision. (*Id.*).  Given these limitations and the testimony of the vocational expert, the ALJ determined, at the fifth and final step of the sequential evaluation process that Plaintiff could perform work that exists in the economy.  Therefore, the ALJ concluded that a finding of not

14

disabled was appropriate.  (R. at 21-22).

Plaintiff first challenges the ALJ's determination at step three of the sequential evaluation process. (Doc. No. 12 at 7).  Specifically, Plaintiff argues that the ALJ erred in determining that Plaintiff fails to satisfy the requirements of Listing 12.05C.  Furthermore, Plaintiff challenges the ALJ's residual functional capacity determination, arguing that he failed to give the requisite detailed function-by-function assessment. (Doc. No. 12 at 24).  According to Plaintiff, the ALJ's failure to give a detailed function-by-function assessment of Plaintiff's residual functional capacity resulted in an inaccurate hypothetical to the vocational expert. (*Id.*).  As such, Plaintiff argues that the Court is without a sufficient basis to determine whether significant probative evidence was credited or ignored and thus his determination should be reversed. (Doc. No. 12 at 24-29).

In response, the Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff did not meet the requirements for Listing 12.05C.  (Doc. No. 16 at 18-19).  Moreover, the Commissioner argues that the ALJ's residual functional capacity determination reflects all of Plaintiff's functional limitations. (Doc. No. 16 at 22-23).

### A.    Whether Plaintiff Meets the Requirements of Listing 12.05C

In regard to the ALJ's determination that Plaintiff does not meet the requirements of Listing 12.05C, Plaintiff makes several specific arguments.  First, Plaintiff contends that she meets both of the requirements of 12.05C, namely, that she has an IQ score of 60 through 70 and she suffers from an additional "severe" impairment. (Doc. No. 12 at 7-9).  Furthermore, Plaintiff contends that these two requirements are the exclusive requirements of 12.05, however, to the extent that "deficits in adaptive functioning" (referenced in the first sentence of 12.05) is an additional requirement,

substantial evidence supports a finding that Plaintiff has long term intellectual deficits. (Doc. No. 12 at 19).

The ALJ determined that Plaintiff did not meet the requirements of 12.05C, insofar as  she "does not have a valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  The Appeals Council, on review, provided the following explanation as to why Plaintiff failed to meet the requirements of Listing 12.05C:

> Although a full scale IQ was reported in 1F/3, the evidence does not support that the claimant meets the diagnostic criteria for mental retardation.  Listing 12.05 requires a significantly subaverage  general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence supports onset of the impairment before age 22 with a valid IQ score.
>
> The record documented that at age 9, the claimant's IQ scores were reported as: Verbal IQ of 73, Performance IQ of 81, and Full-Scale IQ of 75 (Exhibit 1F).  There is no evidence of record that documented adaptive functioning deficits before age 22 to satisfy the diagnostic criteria of listing 12.05 a, b, c or d.

(R. at 6).

In order to be considered mentally retarded under § 12.05, a formal diagnosis of mental retardation is not required.  *See Velardo v. Astrue*, Civil Action No. 07-1604, 2009 WL 229777 at *13 (W.D. Pa. January 29, 2009). Rather, a claimant must meet the requirements of a subsection of § 12.05.  20 C.F.R. pt. 404, subpt. P, app. I, § 12.05.  Section 12.05, Mental Retardation, provides as follows:

> Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

16

> The required level of severity for this disorder is met when the requirements in A,B,C or D are satisfied. ...

20 C.F.R. pt. 404, subpt. P, app. I, § 12.05.

As discussed above, at issue in this case is whether Plaintiff meets the requirements of §12.05C. The requirements in subsection C are as follows:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional or significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. I, § 12.05C.

As a threshold matter, there is a dispute between the parties as to the requirements of § 12.05C that the Court must address. Plaintiff argues that § 12.05C requires only that a claimant have an IQ score between 60 and 70, an additional physical or mental impairment imposing additional work-related limitations of function and that the claimant can show the mental retardation manifested itself before age 22. (Doc. No. 12 at 20). Plaintiff argues that a claimant is not required, under Listing 12.05C, to show that she has "deficits in adaptive functioning." (*Id.*). Plaintiff, however, contends that, regardless of whether there is an additional requirement that she show "deficits in adaptive functioning," the record supports that she had such deficits, insofar as "the evidence [is] consistent with nothing but a history of intellectual impairment." (Doc. No. 12 at 22). In response, the Commissioner contends that a finding of mental retardation requires a determination of whether a claimant has " *deficits in adaptive behavior* initially manifested before the developmental period." (Doc. No. 16 at 19). Specifically, the Commissioner contends that "Plaintiff carries the burden to establish that deficient intellectual functioning manifested itself during the developmental period before age twenty-two." (Doc. No. 16 at 19-20) (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186

17

(3d Cir. 1992)).  Moreover, the Commissioner argues that Plaintiff has failed to show that she experienced deficits in adaptive functioning. (Doc. No. 16 at 20). Rather, the Commissioner contends, "[n]othing in the record establishes that Plaintiff's choices were the result of low intellectual functioning, but rather, were likely undertaken because of socioeconomic status and environmental influences." (*Id.*).

Here, the Court disagrees with the Commissioner that § 12.05C imposes a requirement that a claimant show "deficits in adaptive functioning." While the introductory paragraph to § 12.05 does describe mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," the listing goes on to provide four possible criteria for determining whether a claimant's impairment meets the listing. 20 C.F.R., pt. 404, subpt. P. App. 1, § 12.00A-D, each of which provide specific requirements for a showing of mental retardation.  The United States Court of Appeals for the Third Circuit has held that in order to meet the requirements of § 12.05C, a claimant "must i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003). The Court of Appeals has not held that a claimant is required to prove deficits in adaptive functioning as an additional requirement of § 12.05C; rather, it has outlined a three prong test for determining whether a finding of disabled is directed under this section.  *See Harrison v. Astrue*, Civil Action No. 07-1136, 2008 WL 4133085 at *6 (W.D. Pa. August 29, 2008) (citing *Markle*, 324 F.3d at 187) (holding that, under *Markle v. Barnhart*, "[t]here was no requirement that a claimant show 'deficits in adaptive functioning' as a separate requirement;

18

otherwise, there would be a fourth prong to the test.").[1]  A claimant will be presumptively disabled

if the requirements of § 12.05C are met.  *See Williams*, 970 F.2d at 1184.

The issue then, is whether there is substantial evidence to support the determination that

Plaintiff does not meet the three requirements of § 12.05C.[2]

1.      *Remand is Appropriate for Further Consideration of the ALJ's Determination that Plaintiff Did Not Have a Full Scale IQ of 60 Through 70*

To meet the requirements of the first prong of § 12.05C, the Regulations only require that

one IQ score be in the 60 through 70 range.  *See Williams,* 970 F.2d at 1184.  While the ALJ may

reject an IQ score, he is required to review all of the pertinent evidence of record and explain his

"conciliations or rejections."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).

Furthermore, in rejecting an IQ score, "'[a]n ALJ cannot reject IQ scores based on personal

observations of the claimant and speculative inferences drawn from the record.'"  *Markle*, 324 F.3d

at 187 (quoting *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000)).

As to the first prong of § 12.05C, the ALJ summarily states that Plaintiff "does not have a

full scale IQ of 60 through 70," without further explanation. (R. at 19-20).  Records from Dr. Moran,

however, indicate that Plaintiff was administered a WAIS-III test on July 23, 2003, the results of

---

[1]

Furthermore, the Court notes that, regardless of whether "deficits in adaptive functioning" is a fourth requirement under § 12.05C, the ALJ and Appeals Council failed to do an analysis of whether Plaintiff has said deficits and/or which methodology was employed in order to determine whether deficits in adaptive functioning exist.  *See Velardo v. Astrue*, Civil Action No. 07-1604, 2009 WL 229777 at *14 (W.D. Pa. January 29, 2009) (citing *Logan v. Astrue*, Civil Action No. 07-1472, 2008 WL 4279820 at *8 (W.D. Pa. September 16, 2008)).

[2]

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

which indicate that Plaintiff has a full scale IQ of 70. (R. at 93). According to Dr. Moran, this result

accurately reflected Plaintiff's intellectual functioning at the time of the test. (*Id.*).  Additionally,

while the Appeals Council did note a full scale IQ of 75 at the age of nine, (R.  at 6), it failed to

discuss Plaintiff's inconsistent IQ score of 70 in 2003. (*Id.*). Indeed, neither the ALJ nor the Appeals

Council addressed Dr. Moran's report, let alone give any reason for accepting or rejecting Plaintiff's

IQ score of 70.  *See Velardo v. Astrue*, Civil Action No. 07-16014, 2009 WL 229777 at *9 (W.D.

Pa. January 29, 2009). While the ALJ was not required to accept Plaintiff's IQ score of 70, he was

required to give specific reasons for accepting or rejecting it. *Markle*, 324 F.3d at 186.  Because there

is evidence in the administrative record of an IQ score of 70, and because the ALJ and the

Commissioner failed to account for that evidence in the determination, this Court recommends that

remand is appropriate for further consideration of the first prong of § 12.05C.  *See Colon v.

Barnhart*, 424 F. Supp.2d 805, 815 (E.D. Pa. 2006) (remanding where the "ALJ's written opinion

failed to properly indicate how the ALJ weighed and discounted certain record evidence, which is

relevant to the issue of whether or not the ALJ's ultimate conclusion is supported by substantial

evidence.").

     2.     *Substantial Evidence Does Not Support the ALJ's Determination that Plaintiff Has No Additional and Significant Work-Related Limitations of Function*

The second prong of § 12.05C requires that a claimant establish that she had a "physical or

other mental impairment imposing additional and significant work-related limitations of function."

*Markle*, 324 F.3d at 187.  The United States Court of Appeals has held that a finding of a "severe

impairment" as defined by 20 C.F.R. §§ 404.1520( c) and 416.920( c) at step two of the sequential

20

evaluation process will establish the second prong of § 12.05C.  *Id.* at 187-88.  In *Markle,* the Court

held that where the ALJ determined that the medical evidence established that the claimant had

severe impairments, including chronic obstructive pulmonary disease, hypertension, obesity, gout

and diminished intelligence, which restricted the claimant to light work, this finding established the

second criterion under § 12.05C.  *Id.*; *see also Blackwell v. Comm'r of Soc. Sec.*, Civil Action No.

08-374,  2008 WL 4853824 at * 3 (W.D. Pa. November 6, 2008).

Here, the ALJ determined that Plaintiff had the following severe impairments as defined by

20 C.F.R. § 404.1520( c) and § 416.920( c): alcohol abuse, in remission, drug abuse, in remission,

depressive disorder, borderline intellectual functioning and sickle cell anemia.  (R. at 16).

Additionally, the ALJ found that Plaintiff's physical impairments impose some limitations,

"including reducing her functional capability to work at the light exertional level." (R. at 20).

Moreover, the ALJ determined that Plaintiff had non-physical impairments, noting her treatment for

depression. (R. at 17).  He also found that her severe mental limitations generally impose "moderate

mental functional limitations," and determined that Plaintiff would be limited to simple one-two

step, repetitive jobs without close proximity or contact with co-workers and without decision

making, competitive production rate pace or intensive supervision. (R. at 19). Thus, with respect to

the second prong of §12.05C, the ALJ's findings themselves do not support his determination that

Plaintiff does not have impairments imposing an additional and significant work-related limitation

of function. (R. at 18).  Indeed, the ALJ's factual determination in regard to Plaintiff's physical

impairments and the limitations they impose (*i.e.*, that Plaintiff would be limited to light work, as

a result) supports only a finding that Plaintiff has met the second prong of § 12.05C.  Therefore, the

Court agrees that there is no dispute that Plaintiff has met the second prong of this Listing and

recommends that the ALJ's determination in regard to this prong be reversed and not revisited on remand.

3.    *Remand is Appropriate on the Issue of Whether Plaintiff's Onset of Mental Retardation Manifested Itself During the Developmental Period*

The final requirement of § 12.05C is that a claimant's mental retardation manifested itself during the developmental period, *i.e.*, before the age of 22. *Markle*, 324 F.3d at 187. The Court of Appeals has held that the claimant has the burden of establishing that mental retardation commenced during the developmental period. *Williams*, 970 F.2d at 1186.

Here, there is evidence in the record that, prior to age 22, Plaintiff was required to take special education classes in high school and had not obtained her GED. (R. at 173; 200). Additionally, Dr. Moran indicated that Plaintiff, in addition to having an IQ score of 70 in 2003, was "quite limited" in her abstract verbal reasoning and opined that her reasoning abilities were in the mental retardation range. (R. at 93). Her also opined that Plaintiff had significant perceptual-motor deficits and impairment in her ability to discriminate non-essential details in her visual field. (*Id.*). He determined that Plaintiff was impaired in her ability to learn new, non-verbal material and to perceive cause and effect relationships. (*Id.*). Additionally, he noted that Plaintiff read on a fourth grade level. (*Id.*).

Furthermore, evidence from Dr. Bernstein's examination indicates that Plaintiff showed difficulty in her knowledge of general information. (R. at 100). He indicated that it was "well below average." (*Id.*). Notes from Dr. Friend indicate that her opinion was that Plaintiff was "primitive in her understanding of complex social concepts and problem solving abilities." (*Id.*).

The ALJ, however, did not evaluate any of this evidence in his determination, nor did he attempt to distinguish whether any of these deficits noted by the examiners manifested themselves during the developmental period.  (R. at 20-21).    Furthermore, while the Appeals Council determined that, based on Plaintiff's IQ score of 75 at the age of nine, Plaintiff did not have documented adaptive functioning deficits before the age of 22, the Court finds that the Commissioner failed to properly consider all of the evidence in determining whether Plaintiff's intellectual deficits manifested themselves prior to age 22, given the  significant evidence that she had at least some impairments during the developmental period.[3]  Again the ALJ and Appeals Council failed to properly weigh and evaluate  all of the evidence of record, including the opinions of the consultative examiners, Plaintiff's mental health care providers, and Plaintiff's own testimony in determining whether Plaintiff's impairments manifested themselves before age 22.  Indeed, the ALJ never made any specific finding as to the onset of Plaintiff's Borderline Intellectual Functioning

---

[3]    The Court also notes that the Commissioner somewhat concedes that the significance of an IQ test score of 75 at the age of nine is minimal, arguing that:

> [t]he fact that Plaintiff scored higher on IQ tests as a child is but another factor, and merely indicates that, perhaps, Plaintiff's later years of crack cocaine and alcohol addiction affected her scores.  Regardless, it was not the "exclusive focus" of the Appeals Council's response. The point that the Appeals Council was making is that even with consideration of Plaintiff's adult Full Scale IQ score of 70 ([R.] at 93), she still does not meet the requirements of the listing because there is no showing in the record of deficits in adaptive functioning.

(Doc. No. 16 at 22).  First, the Court reiterates that a showing of "deficits in adaptive functioning" is not a requirement of § 12.05C.  Additionally, the Court notes that the Commissioner's argument regarding the use of alcohol and crack cocaine and their effect on her IQ was not discussed in either the ALJ's determination or the Appeals Council decision. Furthermore, nowhere in the record is there any indication that any consultative examiner or medical care provider ever made such a connection.

impairment, thus the Court is without knowledge as to what, if any, evidence was considered.  *See*

*Markle*, 324 F.3d at 189 (holding that, "it is clear that the record should contain some evidence that

supports the finding that onset preceded age 22" and noting that evidence that the claimant took

special education courses, dropped out of high school two months into the tenth grade,  "struggled"

to obtain a GED, and could not hold down a job could be interpreted to support a finding of early

onset mental retardation). *See also Vivaritas v. Comm'r of Soc. Sec.*, 264 Fed. Appx. 155, 160-61

(3d Cir. 2008) (holding that where the record showed evidence of a mental impairment before age

22, including evidence that the claimant had attended special education classes in high school and

the claimant's testimony that she was "slow at learning things," remand was appropriate as the ALJ

"did not request [the claimant's] educational records, nor did she seek a contemporary medical

opinion concerning the onset age of [her] claimed mental impairments.").  As such, this Court

respectfully recommends that this case be remanded to the ALJ for further evaluation at step three

of the sequential evaluation process in order to develop the record and determine whether Plaintiff

was mentally retarded before age 22.  *See Markle*, 324 F.3d at 182.

Because the ALJ failed to consider and analyze Plaintiff's IQ score of 70, and likewise failed

to consider whether mental retardation had manifested itself before the age of 22, this Court

recommends that the case be remanded for further consideration.  *See Fargnoli v. Massanari*, 247

F.3d 34, 43-44 n. 7 (3d Cir. 2001) (holding that a district court cannot rectify the ALJ's failure to

consider all relevant and probative evidence through its own analysis).

**B.      Whether the ALJ Performed an Adequate Residual Functional Capacity Assessment**

Plaintiff additionally argues that the ALJ erred in his determination of Plaintiff's residual functional capacity. (Doc. No. 12 at 24).   Specifically, Plaintiff contends that the ALJ's determination, while it addresses some of Plaintiff's limitations identified by Dr. Moran, it did not address all of them. (Doc. No. 12 at 28).  Plaintiff argues that the ALJ failed to incorporate her "documented limitations of interacting appropriately with the public, or dealing with routine job stresses or changes in the workplace," resulting in an inadequate hypothetical question to the vocational expert. (Doc. No. 12 at 28-29).  In response, the Commissioner argues that the ALJ properly incorporated all of Plaintiff's functional limitations into his residual functional capacity assessment. (Doc. No. 16 at 22-23).

A claimant's residual functional capacity is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." 20 C.F.R. § 404.1525(a)(1); *see also Fargnoli*, 247 F.3d at 40 (quoting *Burnett*, 220 F.3d at 121) (other quotations omitted)).  The Commissioner determines a claimant's residual functional capacity by performing a function-by-function assessment of a claimant's ability do work related activities. *See* S.S.R. 96-8, 1996 WL 374184 at *1 (providing that, in determining a claimant's residual functional capacity, the Commissioner "must first identify the individual's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis").  *See also* 20 C.F.R. §§ 404.1545, 416.945.   In making this assessment, the Commissioner must consider all of a claimant's impairments and all of the evidence of record.  20 C.F.R. § 404.1545(a)(2); *Burnett*, 220 F.3d at 121 (citing *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986)).

The ALJ made the following determinations regarding Plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, in that she could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for a total of 6 hours in an 8-hour workday, sit for a total of 6 hours in an 8 hour workday, except she needs to sit and stand at will, must avoid cold temperature extremes, limited to simple one-two step jobs, limited to routine repetitive jobs, must avoid work in close proximity or contact with co-workers, must avoid jobs where decision making is involved, must avoid jobs requiring competitive production rate pace, must avoid jobs with intensive supervision.

(R. at 19).   In making this determination, the ALJ considered Plaintiff's testimony that she has depression symptoms twice a week. (R. at 20).   He also indicated that he considered Plaintiff's complaints of aches, pains and fatigue and her testimony regarding her ability to walk only short distances.  (*Id.*).   He likewise considered her history of drug and alcohol additions, both in remission. (*Id.*).   The ALJ specifically relied upon the notes of Dr. Friend, including those indicating that plaintiff was motivated to obtain her GED, that she was able to focus during the examination and that she keeps appointments, reads books and watches television. (*Id.*).   The ALJ relied on Dr. Friend's opinion that Plaintiff had no more than some moderate mental functional limitations. (*Id.*).

As discussed above, the ALJ failed to consider Plaintiff's IQ scores and to properly consider evidence related to her intellectual deficits.   As such, the ALJ's residual functional capacity fails to incorporate any potential findings related to Plaintiff's functional limitations caused by her intellectual deficits. (R. at 19-20).   Therefore, the Court cannot find that the ALJ's residual functional capacity determination is supported by substantial evidence and it is recommended that the ALJ be directed to reconsider this assessment on remand.

**III.     Conclusion**

For the foregoing reasons, it is respectfully recommended that the Commissioner's motion for summary judgment (Doc. No.15) be denied and Plaintiff's motion for summary judgment (Doc. No. 11), be granted, and this case be remanded to the administrative law judge for further consideration, as discussed above.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b) (1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

 s/ Lisa Pupo Leniahn
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: August 28, 2009

cc:     The Honorable Joy Flowers Conti

        All counsel of record